UNITED STATES of America,
Plaintiff–Appellee,

v.

David BUCHANAN,
Defendant–Appellant.

No. 89–2053.

United States Court of Appeals,
Sixth Circuit.

Argued April 3, 1990.
Decided May 25, 1990.

Jennifer J. Peregord (argued), Office of U.S. Atty., Michael O. Lang, Detroit, Mich., for plaintiff-appellee U.S.

Don Ferris (argued), Ann Arbor, Mich., for defendant-appellant David Buchanan.

Before KRUPANSKY and MILBURN, Circuit Judges, and THOMAS, Senior District Judge *.

MILBURN, Circuit Judge.

David Buchanan appeals his conviction for possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1), arguing that the district court erred by denying his motion to suppress evidence discovered during a warrantless search of his residence. For the reasons that follow, we reverse.

## I.

### A.

In January 1987, agents of the Drug Enforcement Administration (DEA) learned from a confidential informant that during 1984 and 1985, multiton quantities of marijuana had been delivered to a residence located at 13909 Scio Church Road in rural western Washtenaw County, Michigan. The informant positively identified aerial photographs of the residence and two outbuildings on the property as the location to which he had transported marijuana. From February until June 1987, DEA ground and aerial surveillance of the property revealed no significant activity.

On June 23, 1987, aerial surveillance detected activity at the Scio Church Road property. DEA pilot Hawthorne Lee observed a burgundy vehicle backed up to the smaller of the two outbuildings and a blue pickup truck with a white camper parked west of the house. At approximately 6:00 p.m., Lee saw a silver vehicle drive up to the garage next to the house, and at approximately 7:15 p.m., he observed the silver vehicle driving away from the area of the smaller outbuilding and leaving the premises. Lee followed the vehicle as it traveled approximately seven miles to a house located at 6550 Esch Road. Shortly thereafter, Lee guided another agent to the Esch Road residence, following the same route earlier taken by the silver vehicle. Because the house was not visible from the road, the agent drove up the one-quarter-mile-long driveway toward the residence, but he turned around when dogs on the property began barking and approached his car.

By 8:40 p.m., DEA agents had established ground surveillance of the Scio Church Road residence, and a dark blue car was observed leaving the property. Two agents followed the car for approximately eight miles before stopping the car for speeding. The driver, Tim Pelkey, consented to a search of the car, and the agents found four boxes of individually wrapped soles of hashish in the trunk of the car. Pelkey was arrested for possession of hashish and transported to the Washtenaw County jail. A short time later, another car was observed leaving the Scio Church Road residence. DEA agents stopped and searched this vehicle also but found no drugs; however, the driver was arrested and kept incommunicado.

DEA agents at the Scio Church Road location decided they had probable cause to believe hashish was presently being stored on the property. Believing that exigent circumstances required securing the premises prior to acquisition of the search warrant, the agents entered the house and the outbuildings at approximately 10:00 p.m. and conducted a cursory check for people and weapons, but did not search the premises. During the cursory check, agents found one person in the house, along with two rifles and a hand gun. In the smaller of the two outbuildings, agents saw several cardboard boxes filled with soles of hashish.

The agents decided they needed to develop additional probable cause in order to

---

* Honorable William K. Thomas, Senior United States District Judge for the Northern District of Ohio, sitting by designation.

obtain a search warrant for the Esch Road residence. At approximately 11:00 p.m., several agents were sent to the residence to conduct surveillance and to develop additional probable cause for a search warrant. The agents established a staging area at the intersection of Altenbrent Road and Esch Road, approximately one-quarter mile from the driveway leading to the Esch Road residence. Esch Road was a dirt road, as was the driveway leading to the house. Shortly after 11:00 p.m., two agents again drove up the driveway approximately 200 yards and saw a barn, but were unable to see the house or any vehicles. Again, the dogs on the property began barking, so the agents turned their car around and drove back to the staging area.

As the agents were returning to the staging area, they noticed a vehicle was following them. After the agents stopped their car at the staging area on Esch Road, the vehicle which was following them, a pickup truck, approached at a high rate of speed and skidded to a stop within fifteen feet of the staging area. The driver, defendant David Buchanan, started to exit the truck, but agents approached the truck, identified themselves, and asked him to exit the vehicle. When Buchanan exited the truck, agents noticed he was barefoot. The agents did not know who Buchanan was until he identified himself and told them he lived at the Esch Road residence. Buchanan explained that he was following the agents because he saw a car in his driveway, and, since there had been a series of thefts in the area, he thought someone was trying to steal his farm equipment.

The agents conducted a pat down search of Buchanan, and while checking the interior of his truck for weapons, agents observed a partially burned marijuana cigarette (a "roach") in the ashtray, but it was not confiscated for evidence. Buchanan later testified that he had no marijuana in the truck. After observing the marijuana in the ashtray, the agents asked Buchanan if he had any more marijuana at his residence, and he stated that he had a small amount at home for his personal use. Buchanan was arrested for possession of marijuana, and Agent John O'Rourke testified that he read Buchanan his *Miranda* rights. Buchanan denies being advised of his *Miranda* rights at the time of his arrest.

At some point during the encounter, the agents asked Buchanan if he had been to the Scio Church Road residence earlier that day, and he said that he had been there doing some excavation work. The agents told Buchanan that they suspected he had a large quantity of marijuana in his house and that they were attempting to secure a search warrant. The agents asked Buchanan if he would consent to a search of his home, but he refused and told them to get a search warrant. Buchanan told the agents that his wife was asleep in the house, and the agents decided to take him back to the house and secure the area to prevent destruction of any contraband.[1]

The agents approached the house with Buchanan in handcuffs, but unhandcuffed him long enough to permit him to put his dogs in a pen. The agents then led Buchanan to the door of his house, knocked on the door and ordered Buchanan's wife to open the door, but the parties disagree as to the details of what happened next. The government claims that the agents told Ann Buchanan that her husband had been arrested for possession of marijuana, that they were attempting to get a search warrant, and that they intended to enter and secure the house. The government contends that Ann Buchanan opened the door and let the agents enter. To the contrary, the Buchanans claim that Ann refused to let the agents come into the house, but offered to come out. The Buchanans contend that the agents then forcibly entered the home.

Once inside, the agents conducted a protective sweep of the house to make sure no one else was present. During the sweep

---

1. DEA Agent John O'Rourke testified that the decision to enter and secure the house was made *before* Buchanan told the agents that his wife was in the house and before Buchanan acknowledged that he had been to the Scio Church Road residence earlier that day. However, actual entry of the Buchanan home occurred *after* the agents learned this information.

agents found no weapons, nor any other person in the house, but agents did observe in plain view in the family room four boxes partially covered by coats, but one of the boxes was open revealing what appeared to be soles of hashish.[2] After finding the hashish, an agent asked Buchanan if he would consent to a search of his house, but Buchanan again refused and told the agent to get a warrant. The Buchanans were seated in the family room on couches facing each other. David Buchanan was handcuffed, but Ann was not. Agents at the Buchanan residence contacted agents at the Scio Church Road residence and informed them that the Buchanans refused to consent to a search, therefore a search warrant would be necessary.

After spending approximately one hour waiting in the family room, the Buchanans asked how long it would take to obtain a search warrant. The agents responded that they did not know, but that they would wait as long as it took. Buchanan also asked if his wife would be arrested, and the agents told him that she would. The Buchanans contend that Ann was experiencing low blood sugar from diabetes, and David was worried about her health if they had to wait for a long period of time for the agents to obtain a warrant. David asked the agents if they would agree to leave his wife "completely out of the case" if he consented to the search. The agents testified that they agreed not to arrest Ann Buchanan that night, but reasoned that they could later indict her. The Buchanans then agreed to permit the search, and both signed consent to search forms on June 24, 1987, at 12:41 a.m., approximately one hour after the agents had entered the house.

After the Buchanans signed the consent form, Ann escorted agents to the basement and unlocked the wine cellar, where agents found approximately 40 kilograms of marijuana. The search of the Buchanan residence resulted in the seizure of the four boxes found in the family room containing approximately 100 kilograms of hashish, the 40 kilograms of marijuana found in the wine cellar, small plastic bags of marijuana found in the freezer, and a shotgun found in the master bedroom. David Buchanan was arrested and transported to the Washtenaw County Jail, but Ann Buchanan was not arrested that night.

### B.

On December 21, 1988, David and Ann Buchanan were charged in a three-count indictment with (1) conspiracy to distribute and to possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846; (2) possession with intent to distribute over 100 kilograms of marijuana, and aiding and abetting in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and (3) criminal forfeiture of property (the Buchanan residence) used to facilitate a federal drug offense in violation of 21 U.S.C. § 853. On February 22, 1989, the Buchanans filed a motion to suppress all evidence discovered during the search of their residence. Following a six-day suppression hearing, the district court denied the Buchanans' motion to suppress.

On June 29, 1989, the Buchanans negotiated a plea agreement with the government pursuant to Federal Rule of Criminal Procedure 11(a)(2) whereby David Buchanan entered a conditional guilty plea to Count II of the indictment for possession with intent to distribute over 100 kilograms of marijuana, but reserved his right to appeal the district court's denial of his motion to suppress the evidence. Pursuant to the plea agreement, the charges in Count I against David Buchanan were dismissed, and all charges against Ann were dismissed. The possible forfeiture of the Buchanan residence under Count III of the indictment is being held in abeyance pending the outcome of this appeal.

On September 8, 1989, the district court accepted the conditional guilty plea, sentenced David Buchanan to a five-year term of imprisonment to be followed by a four-year term of special parole, and imposed a

---

**2.** DEA Agent Donald Nelson testified that the hashish was compressed into brick-like forms known as soles. Each sole was approximately fifty-seven inches long, twelve inches wide and one and one-half inches thick.

fine of $8,000 and a special assessment fee of $50. Buchanan filed a notice of appeal on the same date and was released on a personal bond of $50,000 pending appeal.

The principal issues on appeal are (1) whether exigent circumstances justified the warrantless entry into the Buchanan residence; (2) whether Buchanan freely and voluntarily consented to the search of his home; and (3) whether the inevitable discovery exception would make the evidence admissible absent exigent circumstances or a valid consent to search.

## II.

### A. *Warrantless Entry*

The district court's legal conclusions are reviewed *de novo*, but its factual findings will be reversed only if they are clearly erroneous. *United States v. Sangineto–Miranda*, 859 F.2d 1501, 1512 (6th Cir. 1988). "[A]bsent exigent circumstances, a warrantless entry to search for weapons and contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within." *Payton v. New York*, 445 U.S. 573, 587–88, 100 S.Ct. 1371, 1381, 63 L.Ed.2d 639 (1980). It is well-recognized "that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586, 100 S.Ct. at 1380. "[T]he burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S.Ct. 2091, 2098, 80 L.Ed.2d 732 (1984). "Exigent circumstances justify warrantless entry into a home only where there is also probable cause to enter the residence." *Sangineto–Miranda*, 859 F.2d at 1511 n. 6.

### 1. Probable Cause

■ Buchanan contends that the DEA agents lacked probable cause to believe that there was hashish in his home. Buchanan points out that agents were sent to observe his house and to develop probable cause for a search warrant. At that time, the only basis agents had for suspecting that hashish may be present on the premises was the fact that several hours earlier a silver vehicle had been observed traveling from the Scio Church Road property to the Buchanan residence. Buchanan asserts that only this evidence may be considered in deciding whether the agents had probable cause to enter his house because the other evidence came from admissions he made during questioning by the agents. Buchanan contends that his admissions are the product of an illegal arrest and cannot be considered in deciding whether the agents had probable cause. Absent his admissions, Buchanan contends that the agents lacked probable cause to search his home.

The government argues that the agents had probable cause to believe that marijuana or hashish was present in the Buchanan residence for several reasons. First, the silver vehicle which had been followed to the Buchanan residence was observed driving away from the smaller outbuilding on the Scio Church Road property where hashish was discovered during a security sweep of the property. Second, agents had stopped and searched another car leaving the Scio Church Road property and found soles of hashish in the trunk. Third, during the investigative detention of Buchanan, he admitted that he had been to the Scio Church Road residence earlier that day, a marijuana cigarette was discovered in the ashtray of his truck, and he stated that he had more marijuana in his house. Thus, Buchanan's admissions during questioning are critical to support a finding of probable cause.

Buchanan's residence became the subject of DEA surveillance only because earlier in the day a silver vehicle was observed traveling from the Scio Church Road property to Buchanan's residence. The agents could not identify the driver of the silver vehicle, and they were unable to determine if the vehicle remained on Buchanan's property. In fact, after the initial aerial observation, the agents never again saw the silver vehicle. The agents suspected that the silver vehicle transported hashish to Buchanan's residence because hashish was discovered

in the trunk of Pelkey's car after it left the Scio Church Road property. However, the agents never observed hashish being loaded into the silver vehicle, and, more importantly, the agents did not observe hashish being unloaded from the silver vehicle once it reached Buchanan's residence. It is clear that prior to their encounter with Buchanan, the agents lacked probable cause to believe that hashish was present on Buchanan's property. In fact, during the suppression hearing, an agent testified that Buchanan's residence was placed under surveillance in order to develop probable cause for a search. Therefore, if the agents developed probable cause, it was only through questioning Buchanan.

We do not decide whether Buchanan's admissions must be suppressed as the product of an illegal arrest because we conclude that even if the admissions were legally obtained, the evidence was insufficient to create probable cause to search Buchanan's property for hashish. Buchanan's admission that he had been to the Scio Church Road residence may supply a reasonable basis for believing that he was the driver of the silver vehicle, but it is insufficient to create probable cause to believe that he transported hashish in the vehicle to his residence. Buchanan's admission that he had a small amount of marijuana at home for his personal use also fails to establish probable cause to search his home for hashish. The agents suspected that soles of hashish, like those found in Pelkey's car, had been transported in the silver vehicle, and the agents told Buchanan that they suspected he had a large quantity of marijuana in his home, but Buchanan's admission did not confirm the agents' suspicion. Whether Buchanan's admission gave the agents probable cause to search his home for a small amount of marijuana is an issue involving significant constitutional questions which we need not decide because we also conclude that exigent circumstances were not present in this case. *See Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 108 S.Ct. 1319, 1323, 99 L.Ed.2d 534 (1988) ("[J]udicial restraint requires that courts avoid reaching consti-

tutional questions in advance of the necessity of deciding them.").

2. Exigent Circumstances

The exigent circumstances exception requires the government to "show an objectively reasonable basis for concluding that the loss or destruction of evidence is imminent." *Sangineto–Miranda,* 859 F.2d at 1512. In *Sangineto–Miranda,* we held that

a police officer can show an objectively reasonable belief that contraband is being, or will be, destroyed within a residence if he can demonstrate: 1) a reasonable belief that third parties are inside the dwelling; and 2) a reasonable belief that these third parties may soon become aware the police are on their trail, so that the destruction of evidence would be in order.

*Id.*

This two-part standard was satisfied in *Sangineto–Miranda* where the police knew that two drug traffickers were in an apartment, and one was arrested after he left the apartment and drove to a nearby telephone booth. The drug trafficker who remained in the apartment had been detained earlier that day by DEA agents. We held that the police could reasonably believe that the other drug trafficker was still in the apartment and that his partner's "continued absence, while a search warrant was being secured, would alert [him] that the police were on their trail, thereby prompting him to destroy narcotics." *Id.* at 1513. Thus, we concluded that the police were justified in entering the apartment "without a warrant for the limited purpose of 'securing' the premises and preventing the loss or destruction of evidence." *Id.*

■ In the present case, the agents did have an objectively reasonable belief that a person was inside the house because Buchanan told them that his wife was asleep in the house. The more difficult question is whether the agents also had a reasonable belief that the third party "may soon become aware the police [were] on their trail, so that the destruction of evidence would be in order." *Id.* at 1512. Since Buchan-

an's statement provided the only basis for a reasonable belief that someone was present inside the house, the government is required to show that the agents had a reasonable belief that Buchanan's wife, Ann, might soon have become aware that the police were on their trail. The government fails to satisfy this portion of the two-part test.

Unlike the drug trafficker in *Sangineto–Miranda,* Ann had no contact with DEA agents earlier in the day that may have alerted her that she was under investigation or surveillance. The agents also lacked a reasonable basis for believing that Ann was aware of her husband's absence from the house. The district court concluded that since Buchanan was barefoot when he was stopped, the agents could infer that someone at the house would be expecting him to come back. However, such an inference is not reasonable because Buchanan told the agents that Ann was asleep in the house, and the agents had no independent basis for disbelieving Buchanan. Therefore, the agents could not reasonably have concluded that Buchanan's failure to return would alert Ann that the police were on their trail.

■ Moreover, there is no indication in the record that Buchanan's arrest almost one-half mile from his home caused such a commotion as to alert Ann of the agents' presence. *Cf. United States v. Socey,* 846 F.2d 1439, 1447 (D.C.Cir.) (commotion caused by law enforcement activities outside a residence in a quiet neighborhood may have alerted occupants to police presence), *cert. denied,* 488 U.S. 858, 109 S.Ct. 152, 102 L.Ed.2d 123 (1988); *United States v. Elkins,* 732 F.2d 1280, 1285 (6th Cir. 1984) (arrest of confederate in driveway caused considerable commotion and may have alerted occupants of house to police presence). Indeed, it is reasonable to conclude that Ann became aware of Buchanan's arrest only when the agents approached the house with him in handcuffs. Although Ann's refusal to let the agents enter the house may have given the agents a reasonable basis for believing that evidence in the house was being destroyed,

the government cannot rely on this fact to establish exigent circumstances because the agents created the exigency by approaching the house. *United States v. Hare,* 589 F.2d 1291, 1294 (6th Cir.1979).

Thus, the government fails to establish the existence of exigent circumstances justifying the entry into the residence. Our conclusion that the warrantless entry of Buchanan's home was not justified by exigent circumstances requires suppression of the 100 kilograms of hashish observed in the family room during the protective sweep. However, admissibility of the evidence found during the subsequent search of the house turns on the validity of Buchanan's consent to search.

**B. *Consent to Search***

■ Generally, whether consent to a search was voluntarily given is a question of fact. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). The government has the burden of showing that consent was not contaminated by any duress, coercion, or trickery. *United States v. McCaleb,* 552 F.2d 717, 721 (6th Cir.1977). Whether a consent has been freely and voluntarily given must be determined from the "totality of all the circumstances." *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2047. A district court's finding of voluntary consent will be reversed only if clearly erroneous. *United States v. Rose,* 889 F.2d 1490, 1494 (6th Cir.1989).

■ The district court found that Buchanan freely and voluntarily consented to the search of his home. However, because the district court decided that the warrantless entry of the home was justified by exigent circumstances, it did not confront the question of whether Buchanan's consent was "tainted." Since we hold that the entry of the home was not justified by exigent circumstances, it is necessary to decide if Buchanan's consent was *"sufficiently* an act of free will to purge the primary taint of the unlawful invasion." *Brown v. Illinois,* 422 U.S. 590, 599, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416 (1975) (emphasis in original) (quoting *Wong Sun v.*

*United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963)); *see United States v. Wellins*, 654 F.2d 550, 553 (9th Cir.1981); *United States v. Vasquez*, 638 F.2d 507, 527–29 (2d Cir.1980), *cert. denied*, 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981).

The consequence of "an illegal entry is to make unlawful any ensuing interrogations or searches...." *Vasquez*, 638 F.2d at 527. "[S]uppression is required of any items seized during the search of the house, unless the taint of the initial entry has been dissipated before the 'consents' to search were given." *Id.* Dissipation of the taint resulting from an illegal entry "ordinarily involves showing that there was some significant intervening time, space, or event." *Id.* at 528.

Our review of the evidence reveals no intervening event of significance between the time of the illegal entry and the time Buchanan signed the consent form. Only approximately one hour passed between the time the agents entered the house and the time Buchanan gave his consent to search. *Cf. Vasquez*, 638 F.2d at 528 (passage of only "an hour or so" between entry and consent was not significant, but initial determination of dissipation issue left to district court). Buchanan was handcuffed and seated in the family room of his house in the presence of several agents from the time of the entry until he signed the consent form. Moreover, Buchanan did not consult with an attorney prior to consenting to the search. *Cf. Wellins*, 654 F.2d at 555 (opportunity to consult with attorney prior to giving consent was "crucial factor" in finding the taint of the illegal entry sufficiently attenuated).

Because we have a "definite and firm conviction that a mistake has been committed," the district court's finding of voluntary consent must be reversed because it is clearly erroneous. *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)). As we have explained,

the burden was on the government to show that Buchanan's consent was "*sufficiently* an act of free will to purge the primary taint of the unlawful invasion." *Brown*, 422 U.S. at 599, 95 S.Ct. at 2259 (emphasis in original). Because the government failed to satisfy this burden, all items seized during the search of the house must be suppressed.[3] *Vasquez*, 638 F.2d at 527.

### C. *Inevitable Discovery Exception*

The government argues that absent exigent circumstances or voluntary consent, the evidence seized should nevertheless be deemed admissible under the inevitable discovery exception. In *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1983), the Supreme Court held, "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale has so little basis that the evidence should be received."

The government argues that the inevitable discovery exception is applicable if the government demonstrates

(1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct; (2) that the police possessed the leads making the discovery inevitable at the time of the misconduct; and (3) that the police were actively pursuing [an] alternate line of investigation prior to the misconduct.

*United States v. Webb*, 796 F.2d 60, 62 (5th Cir.1986), *cert. denied*, 479 U.S. 1038, 107 S.Ct. 894, 93 L.Ed.2d 846 (1987). The government contends that the three-part test is satisfied in this case because the agents were pursuing an alternate line of investigation and had begun preparing an affidavit in support of a search warrant for the Scio Church Road residence which would have been extended to include the Buchanan residence. The government also asserts that prior to entry of the Buchanan home, the agents had probable cause for a

---

**3.** Our decision makes it unnecessary to address other voluntariness issues raised by Buchanan.

search warrant which in no way was dependent upon information collected after entry into the home.

We reject the government's argument for application of the inevitable discovery exception. The agents in this case were not pursuing an alternate line of investigation of Buchanan. The agents were sent to observe the Buchanan residence in order to develop probable cause for a search warrant, and if they developed probable cause, it was only through interrogation of Buchanan. However, prior to initiating the warrant application for the Buchanan residence, the agents made an illegal entry into the home which "tainted the only ... investigation that was ongoing." *United States v. Owens*, 782 F.2d 146, 152 (10th Cir.1986).

In *United States v. Griffin*, 502 F.2d 959 (6th Cir.) (per curiam), *cert. denied*, 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974), we rejected application of the inevitable discovery exception after finding that a warrantless entry was not justified by exigent circumstances. We held that "police who believe they have probable cause to search cannot enter a home without a warrant merely because they plan subsequently to get one." *Id.* at 961. "Any other view would tend in actual practice to emasculate the search warrant requirement of the Fourth Amendment." *Id.*

### III.

For the reasons stated, Buchanan's conviction is REVERSED, and the case will be REMANDED to the district court for further proceedings consistent with this opinion.